Filed 4/21/22  In re E.P. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re E.P., a Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>    Plaintiff and Respondent,<br>v.<br>J.P.,<br><br>    Defendant and Appellant. | A163228<br><br>(Sonoma County Super. Ct. No. 6122DEP |

Appellant J.P. (Father) and S.U. (Mother) are the parents of E.P. (Minor), who has serious medical conditions that require around-the-clock care.  Minor has been declared a dependent of the court, and as part of the disposition, the juvenile court ordered Father not to contact Mother.  This is Father's third appeal in this matter.  (See *In re E.P.* (A160714, May 25, 2021) [nonpub. opn.] (*E.P. I*) and *In re E.P.* (A162605, Feb. 22, 2022 [nonpub. opn.] (*E.P. II*).)

Minor requires a mechanical ventilator and constant monitoring by trained caregivers.  At recent update hearings, Father has suggested that Mother could help facilitate his court-ordered in-person visits and caregiver training by acting as the monitoring caregiver during visits and by training

1

him on various aspects of Minor's care. The court, however, has not ordered Mother to provide Father caregiver training and has not required Mother to monitor Minor during Father's in-person visits.

On appeal, Father contends he requested modification of the no-contact order with Mother, and the juvenile court abused its discretion in denying his modification request. In the alternative, he argues the no-contact order must be reversed because the juvenile court failed to comply with statutory requirements. We affirm.

**FACTS AND PROCEDURAL HISTORY**

*Background*

The following facts are taken from our two opinions in Father's prior appeals.

Minor has a rare muscle disorder that has required around-the-clock specialized care for several years. Father and Mother, who do not live together, shared physical and legal custody of Minor prior to this dependency case.

In December 2019, Minor was hospitalized and doctors determined she needed a tracheostomy, but Father would not consent to tracheotomy surgery. On April 2, 2020, the Sonoma County Human Services Department (Department) filed a dependency petition alleging Father failed to protect Minor in that he "failed to provide . . . critical medical treatment for the child." (*E.P. I, supra.*)

At a hearing the next day, Mother's counsel requested a no-contact order "given the disturbing nature of some of the communication [Mother] received from father." (*E.P. I, supra.*) The court ordered the parents not to contact each other before the next hearing.

2

At the next hearing, the juvenile court extended the no-contact order for the parents and authorized tracheotomy surgery for Minor. Minor had the surgery in April 2020. She now has an opening at the neck to the trachea and requires a tracheostomy tube and mechanical ventilator. Minor's post-surgery care requires specific and extensive training for caregivers, including parents.[1]

In July 2020, the Department filed an amended petition alleging Father's behavior following Minor's surgery "continue[d] to place the child at continuing risk of physical harm." (*E.P. I*, *supra*.) The Department recommended Minor be placed with Mother and exit orders be adopted.

### As Part of a Negotiated Settlement, the Juvenile Court Orders Father to Have No Contact with Mother

The same month, the parties reached a negotiated settlement at the hearing on jurisdiction and disposition. As a result, the court sustained the amended petition, ordered Minor to reside with Mother, and ordered services for the parents, including that Father was "to get all support needed for all of his trainings" on tracheostomy care. The court ordered Father to have no

---

[1] The Medical Director of the Pediatric Intensive Care Unit at UCSF outlined the training required for caregivers. He wrote that patients who are dependent on mechanical ventilation, such as Minor, "require 24/7 monitoring by a responsible trained caregiver. In most cases, this requires a minimum of 3 trained caregivers. [¶] Caregiver training includes: assigned didactic video, hands on training of tracheostomy stoma care, tracheostomy tube change, tracheostomy suctioning, medication administration (e.g., aerosolized medications), and the training in medical equipment (i.e., ventilator, humidification, emergency kits, resuscitation bag, suction devices, oxygen equipment). . . . [E]ach caregiver must receive training in 8 emergency scenarios, and must successfully complete tracheostomy care, including tracheostomy tube change, 3 times under direct observation by the medical team. . . . [In addition], primary caregivers are required to complete 48 hours of direct patient care in the hospital." (*E.P. II*, *supra*, fn. 3.)

contact with Mother, as he was required to go through the Department to communicate with Mother.[2]

Obtaining tracheostomy and ventilator training for Father has proved challenging. In October 2020, the social worker reported a service had been identified that could provide in-person ventilator training for Father at Mother's home with nursing staff present and Mother away from her home. But Mother had recently decided she did not want Father in her home under any circumstances because he had ignored her request for no contact. (Minor's doctor recommended that Minor needed to stay home for the foreseeable future because safe transportation had not been determined, so any in-person training or visits with Minor would have to occur at Mother's home.)

<u>The Court Orders In-Person Visitation for Father and Minor</u>

Father has had consistent supervised visits with Minor by video three times per week. At the interim hearing on October 14, 2020, the juvenile court ordered supervised, *in-person* visits for Father for one hour per week at Mother's home with nursing staff present.

Arranging in-person visitation at Mother's home has also proved challenging. In January 2021, the social worker reported that Minor's at-home nursing provider refused to provide the staffing needed to facilitate in-person visits because of Father's past threats to staff, and Mother had begun looking for a new at-home nursing agency.

Father asked the social worker for "couples counseling" for him and Mother, but Mother was not open to participating in such services. (*E.P. II, supra.*)

---

[2] Father appealed, and we affirmed the juvenile court's jurisdictional and dispositional orders on May 25, 2021, in *E.P. I, supra.*

For the six-month review hearing, the Department recommended the court order continued services for parents and find reasonable services had been provided or offered.  Father requested a contested hearing.

At the contested hearing on April 5, 2021, Father testified that he wanted to see his daughter in person without any conditions.  The social worker reported a new nursing agency had been identified that was willing to provide staffing so Father could have in-person visits.  The social worker estimated that in-person visits could be set up in a couple of weeks.  The juvenile court adopted the Department's recommendations and ordered further services.[3]

*Events Related to the Current Appeal*

At the close of the hearing on April 5, 2021, the juvenile court scheduled a follow-up hearing for June 24.[4]  On May 24, the Department sent notice of the June 24 hearing, stating the social worker was recommending no change in orders, services, placement, custody, or status.

On June 24, the juvenile court held the scheduled hearing for an oral report from the social worker, Chris Carmichael.  Carmichael stated that arranging in-person visitation had been "complex," and such visits had not started yet because of staffing issues with the new nursing agency.[5]

---

[3] Father appealed, and we affirmed the juvenile court's six-month review findings and orders on February 22, 2022, in *E.P II, supra*.

[4] All further dates are in 2021.

[5] Carmichael reported that the Department had been in contact with a new nursing agency with the understanding the new agency could provide staffing for in-person visitation, but the agency had become nonresponsive. (It turned out the agency contact person had gone on vacation and then became very ill.)  Carmichael then learned that the hiring of the new agency would be further delayed because of a county requirement that contracts for

Regarding the difficulties with arranging in-person visitation, County counsel observed there were not many at-home nursing providers to choose from in the area and, "we just have to keep pushing." Minor's counsel reported that Minor had been doing well, and he thought the Department had been "exhausting every effort" to provide services for Father.

Father was frustrated; his counsel stated, "[W]e all have to admit that all of us have failed at this point in our efforts to try to reunify this family. [¶] At this point, the only thing I can do is ask the Court to make an order that he has visits immediately. I don't know how to effectuate that, but that's the only thing I can ask. [¶] . . . I don't know if there's a night nurse that could do overtime, just one time so that he can see his kid [in person]."

Carmichael responded that the new nursing agency could not extend the hours of the night nurses. Minor did not have day nurses; Mother took care of Minor during the day, but Mother was "not comfortable being at the house if [Father] is there." Mother was currently trying to find day nurses to provide respite care for herself and Minor.

Father's counsel then asked "about possibly some sort of co-parenting therapy between the parents so that the relationship is not so strained." Mother's counsel told the court that Mother would not voluntarily engage in co-parenting. She stated that Mother "had set boundaries" (referring to the no-contact order) and Father had "crossed" those boundaries.

---

such services had to be submitted to the county's human services department to ensure the position being contracted for did not conflict with existing positions in the county. Finally, on June 23, (the day before the hearing), a contract had been signed with the nursing agency, but the agency had not hired nurses for the position. The upshot was that in-person visits had not started.

6

The court asked whether Carmichael had seen Minor in person, and when he said he had, the court stated, "If you've seen [Minor] in person, there's no reason that [Father] cannot see her in person, that . . . seems to me to be self-evident."

Mother (who, again, did not want to be in the house when Father was there) explained that when she cared for Minor during the day, she needed to be within reaching distance of Minor "if for some reason she aspirates, if her circuit disconnects, if one of her alarms goes off." Mother told the court, "There is no way that she can be left alone without somebody who can[] do an inline suction on her."

Father told the court that he and Mother "have this feud with each other that's been going on for quite awhile." He suggested that if the feud were "solved," Mother could train him on tracheostomy care and then he "could take [Minor to his] home."

Mother said she did train new caregivers on much of Minor's care, but a respiratory therapist from Best Home Care provides "vent training" for any new caregivers.

<u>The Court Orders Co-Parenting Counseling for Father and Mother and Modifies the No-Contact Order to Permit Such Counseling</u>

The juvenile court observed, "So maybe what we need to do is get co-parenting counseling going. These are co-parents, and . . . they have to be able to be in the same room if that is our only option. [¶] So I am going to be ordering co-parenting counseling."

Father's counsel stated, "The Court did issue a no contact order. [O]bviously, we ask that that be amended for the co-parent counseling, as well as any type of training or visitation."

The court ordered an exception to the no-contact order for court-ordered co-parent counseling. The court said it would allow another exception to the

no-contact order for "training if we get to that point." The court observed that it had hoped the new nursing agency would facilitate in-person visitation for Father, but, "It hasn't turned out." The court stated it wanted the Department to continue to pursue in-person visits with the new nursing agency providing staff, "But I think that co-parent counseling, at this point, with the lack of in-person visits is the only way we're going to go."

At the close of the hearing, Father's counsel asked for a check-in hearing. The court agreed and scheduled a hearing for July 29.

On July 29, the juvenile court held the scheduled hearing for an oral update from Carmichael. Regarding in-person visitation, he reported that Father had one in-person visit with Minor on July 9; this visit was possible "because the nurse that does the overnights was able to extend her time on that one day and was able to be there for us to have a visit." Carmichael further reported that the previous day (July 28), the nursing agency said it was hiring a local nurse that "they say should be able to pick up a regular visitation schedule once they have completed the onboarding [of the new nurse]."

Regarding co-parenting counseling, Carmichael told the court the parents were on two separate waitlists for counseling, and they were also enrolled in co-parenting classes.

Minor's counsel said he thought Carmichael was doing a great job in using every resource available. About in-person visits, he reported, "I know [Minor] wants to see her dad but also keep those visits within boundaries that [Minor] wants to have maintained. She wants to have some guardrails

there and so far as, you know, regular father-daughter conversations and . . . keep it simple right now."[6]

Father's counsel stated that Father was pleased to have the visit, but "it's one visit without any future visits scheduled . . . ." She understood that the visit was "awkward, sort of through a window or something," but now that Minor had been vaccinated, "future visits will be a little more fluid and less rigid." Father's counsel told the court Father was frustrated about being on a waitlist for co-parenting counseling.

Father then told the court he did not understand why Mother could not just facilitate his in-person visits by serving as the caregiver and "teach[ ] him on the trach." Father stated this was what Minor wanted, too. The court disagreed noting, "[M]inor's perspective is being well represented by [her counsel]."

The court hoped co-parent counseling would begin soon stating, "Because I do agree with Dad that going forward co-parenting counseling, mutual decisions made without animosity perhaps in the future, even being in one another's presence in the future after co-parent counseling, when deemed appropriate, will be helpful to [Minor]."

## DISCUSSION

Welfare and Institutions Code section 213.5 and California Rules of Court, rule 5.630 govern the issuance of restraining orders in juvenile

---

[6] Previously, the Department reported that "Minor wanted the visits to continue to be supervised so Father could be redirected away from discussion of her medical conditions. Minor said, 'I don't want him talking about my health because he doesn't make good decisions and I feel uncomfortable when he asks about my mom.' Minor told the social worker she wanted her opinions to be considered by the court for future decision making." (*E.P. II*, *supra*.)

9

proceedings.[7] (*In re L.W.* (2020) 44 Cal.App.5th 44, 49.) Section 213.5, subdivision (a), authorizes a juvenile court to issue an order "enjoining a person from . . . coming within a specified distance of, or disturbing the peace of any parent . . . ."

In July 2020, the juvenile court ordered Father not to contact Mother as a part of the disposition following a negotiated settlement. On appeal, the parties agree that section 213.5 is the source of the court's authority for issuing the no-contact order at disposition.

This appeal relates to the juvenile court's rulings at the update hearings of June 24 and July 29, 2021, only. Father contends that he requested modification of the no-contact order restraining him from communicating with Mother and that the juvenile court abused its discretion in denying the requested modification. In the alternative, Father argues the no-contact order must be reversed because the juvenile court failed to comply with the procedural requirements for issuing restraining orders generally.

A.    *Father's Requests to Modify the No-Contact Order*

Initially, respondent argues Father cannot challenge the juvenile court's claimed failure to grant his modification request because he did not properly petition for modification of the existing no-contact order under section 388.[8] We agree.

Under section 388, a parent "may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change,

_____

[7] Further undesignated statutory references are to the Welfare and Institutions Code and rule references are to the California Rules of Court.

[8] Father acknowledges on appeal that a restraining order (such as the no-contact order in this case) "may be *modified* on the court's own motion or *in the manner provided for in . . . section 388* and rule 5.560." (Rule 5.630(k)(1), italics added.)

10

modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. The petition *shall* be verified . . . and *shall* set forth in concise language any change of circumstance or new evidence that is alleged to require the change of order . . . ." (§ 388, subd. (a)(1), italics added.)

To obtain a hearing on a section 388 petition, the petitioner must make a prima facie showing (1) of change of circumstance or new evidence and (2) that the requested modification is in the child's best interest. (*In re Samuel A.* (2020) 55 Cal.App.5th 1, 6–7; § 388, subd. (d).) At the section 388 hearing, the petitioner "bears the burden to show both a legitimate change of circumstances and that undoing the prior order would be in the best interest of the child." (*In re A.A.* (2012) 203 Cal.App.4th 597, 611–612.)

When a "noncustodial parent seeks modification of an existing order, he *must comply* with the *specific requirements* of section 388. These requirements may not be avoided by making the motion in a section 364 [period review] hearing." (*In re Elaine E.* (1990) 221 Cal.App.3d 809, 815, italics added.) An oral request to modify an existing order is insufficient because it fails to provide the requisite prior notice. (*In re Natasha A.* (1996) 42 Cal.App.4th 28, 36.)[9]

Here, Father does not dispute that he failed to comply with the requirements of section 388. He did not file a verified petition, he did not "set forth in concise language any change of circumstance or new evidence that is

---

[9] In fact, a juvenile court may *not* "change, modify, or set aside its previous orders without advance notice to the minor and to [the agency]." (*In re Natasha A., supra,* 42 Cal.App.4th at p. 34.) Neither Minor nor the Department (nor Mother) objected to the court modifying the no-contact order between the parents to permit co-parenting counseling, however, and that modification is not at issue in this appeal.

11

alleged to require the change of order" (§ 388, subd. (a)(1)), and he did not give the parties prior notice of his request. Under these circumstances, the trial court did not err in denying Father's requests to modify the no-contact order. (See *In re Natasha A.*, *supra*, 42 Cal.App.4th at pp. 34–35 [affirming denial of a parent's request for supervised visitation; "the only way [the parent] could obtain a change in visitation was by filing a petition under section 388"].)

In his reply, Father argues that respondent has waived or forfeited its "procedural objection" to his request for modification of the no-contact order. He cites *In re Dakota S.* (2000) 85 Cal.App.4th 494, 501, in which the court explained, " ' "An appellate court will ordinarily not consider procedural defects or erroneous rulings, in connection with relief sought or defenses asserted, where an objection could have been but was not presented to the [trial] court by some appropriate method. . . . The circumstances may involve such intentional acts or acquiescence as to be appropriately classified under the headings of estoppel or waiver. . . . Often, however, the explanation is simply that *it is unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial." ' " (*Ibid.*) But in *Dakota S.* (and cases described therein), the rule of forfeiture applied to an *appellant* who was asking an appellate court to find error and reverse the trial court on an issue the appellant had failed to raise with the trial court; in none of the cases was forfeiture applied to a respondent to prevent the respondent from raising arguments in support of affirming the trial court's ruling. (*Id.* at pp. 501–502.)

Forfeiture is a rule of fairness. There is nothing unfair about respondent pointing out in this case that the juvenile court properly denied Father's request for modification of the no-contact order because the request

was procedurally improper and failed to give proper notice to the parties, including Minor.[10]

In any event, the juvenile court did not err in denying Father's request because it was Father's burden to show relevant changed circumstances that would warrant modification of the no-contact order, and he failed to do so. (See *In re Natasha A., supra,* 42 Cal.App.4th at p. 36 [assuming the parent's "oral request for supervised visitation was effective, the juvenile court's denial of the request was still proper because [the parent] failed to show sufficient changed circumstances"].)

Again, Father never filed a written modification request setting "forth in concise language any change of circumstance or new evidence that is alleged to require the change of [the no-contact] order." (§ 388, subd. (a)(1).) The entirety of Father's oral request for modification is as follows. At the June 24 hearing, Father said, "So [Mother] and I have this feud with each other that's been going on for quite awhile. And, obviously, nothing is going to be solved until this feud is solved. If this feud is solved, I could go over there. She could train me on the trach. I could take [Minor] home." Then, after the juvenile court ordered Mother and Father to attend co-parenting counseling, Father's counsel stated, "The Court did issue a no contact order. [O]bviously, we ask that that be amended for the co-parent counseling, as well as any type of training or visitation." At the July 29 hearing, Father

_____

[10] Father also claims respondent should be barred from arguing his modification request does not comply with section 388 under principles of judicial estoppel. We disagree. Respondent has not taken inconsistent positions as to Father's request to modify the no-contact order to require Mother to attend his in-person visits or train him on caregiving. The fact that the Department agreed to modification of the no-contact order for co-parenting counseling is not contradictory and certainly does not mean Father is now forever excused from complying with section 388 in these proceedings.

13

said, "At some point her mother and I are going to have to get along. I just see no reason why she can't be there while I visit with [Minor]. That would solve this problem. It would have solved this whole problem last year. This all would have been over with a long time ago if she had just been cool with being there while I was there and teaching me on the trach. [¶] I mean, I already know everything about the trach anyhow, but she could give me the low down on the whole thing just like a nurse could do. And, you know, since we're going to have to co-parent eventually anyways, I see no reason why we have to wait. It's just another form of torture." His counsel did not request modification of the no-contact order at that time.

Neither Father nor his counsel ever argued changed circumstances or new evidence required a modification to the no-contact order under section 388. To the contrary, Father suggested his conflict with Mother was longstanding and unchanged. As to Father's counsel's request to amend the no-contact order, the juvenile court apparently understood the reference to amending the order to permit, "as well as any type of training or visitation" to mean *in the future* if the court were to require Mother to attend Father's in-person visits or train him on aspects of Minor's care, then Father would be asking to amend the no-contact order for those purposes as well. The court responded to counsel that it was making "an exception [to the no-contact order] for co-parent counseling and training *if we get to that point*." (Italics added.) This was a reasonable understanding of Father's counsel's request, and counsel did not clarify that it was asking for an exception to the no-contact order *now* for training and in-person visitation. On this record, Father has failed to meet his burden of proving that changed circumstances required a modification of the no-contact order.

B.    *Procedural Challenge to the No-Contact Order*

Next, Father claims the no-contact order must be reversed because the juvenile court failed to comply with statutory requirements of section 213.5, subdivision (f).  We agree with respondent that the no-contact order, which was made in July 2020 at the hearing on jurisdiction and disposition as part of a negotiated settlement, is not a proper subject for the current appeal.

In this case, Father appealed the disposition (although he did not raise the procedural challenge he now makes), and we affirmed the jurisdictional and dispositional orders in *E.P. I*, *supra*.  Our decision is final, and Father cannot challenge the disposition again in this appeal.  (Cf. *In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1150 ["an unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order"].)

Father responds in his reply that the no-contact order is appealable because it was reissued or modified at the June 24 hearing, and that order is appealable.  Assuming for the sake of argument the no-contact order as modified is appealable, Father's argument is forfeited.

" 'A party forfeits the right to *claim error* as grounds for reversal *on appeal* when he or she fails to raise the objection in the trial court. [Citations.]  Forfeiture . . . applies in juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings.' [Citation.]  A party may not assert theories on appeal which were not raised in the trial court." (*In re C.M.* (2017) 15 Cal.App.5th 376, 385, italics added.)  "Considering an issue for the first time on appeal is often unfair to the trial court, unjust to the opposing party, and contrary to judicial economy because it encourages the embedding of reversible error through silence in the trial court." (*In re M.H.* (2016) 1 Cal.App.5th 699, 713–714.)

15

Had Father raised the procedural issue he argues now with the juvenile court, the court could have addressed the issue, saving everyone time and judicial resources. His appellate argument is forfeited. Here, we observe that Father has appealed three times, and each time he has raised issues that were not raised before the juvenile court. This is not fair to the juvenile court or to the other parties, including Minor.

C.    *Respondent's Request for Judicial Notice*

Finally, respondent argues Father's appeal is moot because, although he claims to appeal from the denial of requests to modify the no-contact order, what he actually wants is in-person visitation. In connection with this argument, respondent has filed a request for judicial notice of a subsequent juvenile court order filed December 29 ordering supervised in-person visits for Father. We have disposed of Father's appeal without reaching respondent's mootness argument. Therefore the related request for judicial notice is not relevant, and we deny the request.

## DISPOSITION

The juvenile court orders of June 24 and July 29, 2021, are affirmed.

_____
Miller, J.


WE CONCUR:


_____
Richman, Acting P.J.


_____
Mayfield, J.*


A163228, *Sonoma County Human Services Department v. J.P./In re E.P.*

---

\* Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.